MOORE, J.
|, After a jury found the defendant, Robert James Sellers, Jr., guilty of aggravated battery and attempted incest in violation of La. R.S. 14:34 and 14:78, respectively, the trial court imposed sentences of seven years and ten years for each count, to be served concurrently. The defendant filed this appeal challenging the sufficiency of evidence to support the convictions and the constitutionality of the harsh sentences. For the following reasons, we affirm the defendant’s convictions, vacate the sentences, and remand with instructions for resentencing.
FACTS
The defendant, Robert James Sellers, Jr., suffers from mild mental retardation. He has an IQ of 65, difficulty understanding language, a significant speech impediment, and several social and psychological disorders that make it very difficult for him to cope with ordinary life situations. Dr. Mark Vigen, an expert in forensic psychology, characterized Mr. Sellers’ disabilities to the jury:
[TJhis is a man who has significant cognitive limitations, you know, [his] testing in school as a student and then as an adult person with limited cognitive abilities. He has social disabilities. He has language disabilities. And all these factors including poor school performance, poor work performance, poor social performance, I’m merely telling the Court that these all — he has minimal abilities to really handle life well. He’s a dis— he’s a man with significant disabilities. And he’s — he’s not functioned well in life because of these disabilities.
According to Dr. Vigen, Robert’s mental disabilities placed him in the lowest one percent of the population.
| gSimilarly, Dr. Richard Williams, an expert in forensic psychiatry, also examined Mr. Sellers as part of the sanity commission.[1] At trial, he reviewed several of the factors he considered in his competency evaluation, and he commented on where Mr. Sellers stood in relation to the norm of the general population:
So I’d give a rate of where — of basically how they’re functioning. That has to do with dealing with people, coping with their world. And I give him a 50, 55. So he’s 50 or 55. Somebody who’s psychotic out of touch [sic ] with reality that probably needs hospitalization would be — probably 20 or 25. Someone who’s functioning in here today is, you know, we’re all 80, 85 or above. So that’s kind of where I see him.
Robert had a history of problems in the home and at school. His mother, Barbara Sellers, testified that Robert’s father, now deceased, abused Robert because of his limitations. She testified that her husband *1238 sexually molested their daughters, and she suspected that he may have molested Robert based upon comments made to her by her younger daughter, Trish. Robert’s father physically abused him, reportedly beating him with a whip. In addition to his mental retardation, Robert was born with a double-cleft palate only partially repaired by surgery, leaving him with a speech impediment. He suffers from dys-thymia (general, long-term depression) and is socially withdrawn.
At the time of the incident from which these proceedings arose, Robert was 26 years old and living in a mobile home with his mother. The home is located in a secluded rural area of Bossier Parish on approximately 125 acres of land that the family members inherited from their father and |,^partitioned among themselves. However, Robert donated his share of land inheritance to his mother.
Latrisha “Trish” Schact, the younger of Robert’s two older sisters, testified that Robert had been physically abused by their father and had expressed suicidal thoughts at a young age. Deputy Bill Mazike of the Bossier Parish Sheriffs Office (BPSO) testified that in 1996 or 1997, he was dispatched to the trailer to search for Robert, who had taken a butcher knife into a wooded area stating that he intended to commit suicide. Robert was found and later taken to a hospital.
On the morning of November 28, 2009, Barbara and Robert were home alone. Barbara testified that she was awakened by Robert knocking on her bedroom door. He told her he needed to talk. She testified that she got up and “[w]ent into the kitchen, got me a diet coke, popped it, [and] took my medicine.” Then,
.... He walked up behind me, patted my butt. I said, Robert you know this is wrong now back off. I thought he backed off and I started walking toward my bedroom. He came up behind me and started pulling my pajama bottoms down....
[[Image here]]
He just started pulling my pants up— my pants down. And I kept saying, Robert back off, back off. And he just kept on. He was just in a different world. Usually when he starts something like this I usually can call him off. But it didn’t go off. He finally got my pajamas off. I fell on the floor. He tried to finger me. I said, you touch me, you better not. I managed to get back up and try to run to my bathroom. He’s still right on top of me. I fell again. He went to try to finger me again. And that’s when I hollered and said, if you touch me in any form of way you might as well kill me. I am your mother.
Barbara testified she was able to get away from Robert and managed to get into her bathroom and lock the door.
|4Asked if she had felt Robert physically tried to touch her vagina, Barbara said, “It felt a little like he rubbed, but that’s about it.”
Asked if Robei’t had ever attempted something like this before, she said,
He has tried to, you know, not as— like this time. He would touch, you know, come in pop my bottom and say it’s mine. And I would say, no it’s mine back off. Usually he would back off but that one day he would not back off. He was, you know, in a different world.
Elaborating on this, she said: “He had glassy eyes like he was angry, real hostile, you know, wanting to push me and — onto the different — the beds and all.”
Coming out of the locked bathroom after a while, Barbara left the trailer and drove to the nearby home of her daughter Trish. She testified that she did not see Robert in the trailer when she left and did not see *1239 him until he returned the next day. She told Trish about the incident and sought advice on how they could obtain help for Robert. Barbara said that Trish’s husband agreed that they needed to seek help for Robert, and he suggested that they contact a Mr. Bobby Masters for advice. According to Trish, Mr. Masters was a former detective for Bossier Parish and a close friend of theirs. Barbara and Trish spoke with Masters, who advised them to call the BPSO, which dispatched Deputy Carroll Parker to the home to detain Robert for a civil commitment. However, Robert could not be located when the deputies arrived at the home. He had apparently fled into the nearby woods. Deputies proceeded to search for Robert. Trish warned that Robert had his rifle and had said that he would shoot anyone that got in his way. IsAfter an unsuccessful day-long search for Robert, Barbara suggested that they call it off, believing that Robert would return home on his own as he had done in the past.
Robert did return home the next day, and closed himself up in his room. Barbara tried several times to speak with him. Robert stated that he wanted to kill himself. She saw Robert place the rifle’s muzzle in his mouth. Barbara feared he was going out in the woods to commit suicide. She called Trish on her cell phone, who, in turn, called the sheriff’s office.
Following Trish’s call, three deputies went to the Sellers’ mobile home with the intention of detaining Robert for a civil commitment. They found Barbara Sellers standing in the doorway at the back of the trailer and trying to persuade Robert to put away the gun. She said Robert had been threatening to kill himself. Lieutenant Ammons removed Barbara from the scene and summoned the other two deputies waiting nearby. He attempted to defuse the situation by talking to Robert from the back door of the trailer. After a 30-minute standoff, Lieutenant Ammons fired his Taser at Robert and charged into the trailer with Deputy Jay Brown and Sergeant Darron Kerry behind him. The three officers struggled with Robert on the bed while trying to subdue and handcuff him. As the deputies made physical contact with Robert, the rifle discharged, and the bullet grazed Lieutenant Ammons’ right arm,[2] causing a visible flesh wound.
After the officers handcuffed Robert, he was arrested and taken to the Bossier Maximum Security Facility (BMSF). He was charged with | (¡attempted first degree murder and attempted forcible rape by bill of information filed on January 8, 2010. After awaiting trial while being detained for nearly three years at the BMSF,[3] jury selection for trial commenced on September 10, 2012. Before jury selection began, the bill of information was amended in court to charges of attempted manslaughter and attempted incest.[4] Robert entered the dual plea of “not guilty” and “not guilty by reason of insanity.”
Barbara Sellers’ testimony, as recited above, was the sole evidence adduced in support of the attempted incest charge. All three officers testified at trial regarding their involvement in the shooting inci *1240 dent, for which Robert was convicted of aggravated battery.
Deputy Ammons testified that he arrived at the residence first. He heard loud talking coming from the trailer as he knocked on the door. When no one came to the front door, he went to the backside rear of the trailer and observed Barbara Sellers standing on top of the steps to the open back door of the mobile home. He said he heard Ms. Sellers tell Robert to put the gun down.
Ammons pulled Ms. Sellers away from the door, and summoned Deputies Brown and Kerry, who were waiting at the road per his instructions, to assist him. Am-mons then made contact with Robert from the top step, where Ms. Sellers had been standing, while Brown and Kerry |7took positions on the ground on opposite sides of the steps. Each officer testified that he saw Robert in the back bedroom of the trailer, sitting on the edge of the bed with a rifle pointed upward toward the ceiling.
Trying to peaceably resolve the situation, Ammons testified that he attempted to develop a rapport with Robert by speaking casually with him for about 30 minutes on subjects such as hunting and rifles. He obtained a cigarette from Robert and smoked it. When he obtained a second cigarette from him, Robert tossed him his lighter, but it fell short. As Robert reached toward the floor to pick up the lighter, Ammons saw an opportunity to use his Taser on him and charge him. He testified:
I thought I had an opportunity. He was holding the gun with the barrel. And when I asked him for a lighter he threw the lighter but he didn’t throw it far enough. So he reached for the lighter and had the gun like this and I thought I had opportunity then to get in there and be — defuse the situation.
* * *
Well, I shot him with the taser. And he had a big coat on too, so the taser didn’t have a whole lot of affect [sic]. And I’m rushing in. And as I’m rushing in he comes from here to here and in that process of me grabbing him he shoots.
The prosecutor asked Ammons to demonstrate to the jury Robert’s hand motions with respect to the trigger housing and pointing the rifle. Ammons stated:
Starting out he has the weapon like this with the barrel pointing straight up in the air. WTien he throws me a lighter I can’t reach the lighter. So he reaches for the lighter like this. At that point that’s when I shoot the taser and rush in. And this time he comes from like this to bang light that.
(Prosecutor) Where did his left hand go?
To the trigger.
IsAmmons insisted that Robert intended to shoot him. He testified that he saw Robert’s left hand go to the trigger and Robert pointed the gun at him. He said he knows that Robert pointed the rifle at him because “you don’t get shot without somebody pointing a gun at you.” Photographic evidence introduced by the state showed a bullet hole in the ceiling from the shot that was fired.
Ammons’ description of the incident at trial included several details that were not found in the police report he wrote the morning after the incident. Ammons explained why he was able to recall Robert’s actions at trial in so much greater detail from what he entered in his written police report:
Well, and it’s commonly known in any high stress situation you gain more memory of the — what happened the further you distance yourself from that. It’s hard to remember once you’re in a high stress situation exactly what hap *1241 pened, what actually has took place in what order. I mean, it’s all — you know, we’re talking about a what? Five second situation all this happened. It was really quick. So as — as you have time to process what all happened you remember more. You remember more about what went on.
On cross-examination defense counsel asked Ammons why he never mentioned in his police report that Robert pointed the rifle at him or that he saw Robert’s hand go to the trigger. Apparently reading from Ammons’ police report (which is absent from the appellate record), defense counsel further questioned Ammons about details not in his report:
So at the time you wrote your report you said that when you shot him with the taser [ ... ] “at the same time I began running toward him. The taser prongs hit him and he went straight back on the bed at about the same time I was attempting to grab the barrel of the gun when I heard a shot.... I then threw the gun on the floor and tried to secure it.”
1 aAmmons said that he did not include those details (pointing the gun and reaching for the trigger) in his report because “it was obvious:”
If you get shot, somebody points a gun at you. You’re — I mean, somebody’s got to point a gun at you for you to get shot. So I thought it was an obvious point there.
When asked why he did not include in his police report account that the defendant reached for the trigger when he tried to grab the barrel of the gun, Ammons stated:
Somebody’s got to pull a trigger for it to go off. And so I thought it was obvious. You get shot. Somebody pulls the trigger. I mean, a gun doesn’t go off by itself.
Ammons acknowledged that he and the other officers were at the trailer for purposes of an emergency commitment of Robert. Although he said he did not think that Robert ever said he was going to kill himself, nor did he ever threaten him (Am-mons), Robert did place the barrel of the gun in his own mouth several times which he (Ammons) took to mean that he might kill himself.
Before Ammons fired his Taser and charged Robert, he signaled to Deputies Brown and Kerry that he was about to take action. Both deputies were able to charge in immediately behind Ammons as he went into the room. Neither of these two deputies, however, were able to see Robert point the muzzle of the rifle at Ammons.
Officer Jay Brown of the Shreveport Police Department was a BPSO deputy at the time of the incident. He testified that he was on the right side of the staircase at the back door. Ammons removed his Ta-ser, hiding it behind his leg, and made eye contact with Brown, signaling that something |inwas about to happen. He said Ammons suddenly ran in the back door. Deputy Kerry ran in right behind Ammons and he (Brown) was right behind Kerry by “half an inch.”
Brown did not see Robert make any actions with the firearm because his view of Robert was blocked by Kerry and Am-mons. He heard a loud pop, but did not know if it was the Taser or the rifle. Brown described the scene as follows:
When we ran into the room Lieutenant Ammons went over the top of — of the defendant and Kerry went over the top of the defendant also. And I came in third and I was over all of them. He was — he was fighting with us, you know, he — swung at Deputy Kerry and Lieutenant Ammons a couple of times. And *1242 he — we couldn’t get his arms, you know, out from underneath him. An then — I mean, we were fighting. Also we had the — I guess the taser Lieutenant Am-mons had the — the wires were wrapped around everybody. So every time he tried to use the taser it pretty much shocked every one that was connected to the taser.
Brown said the rifle eventually fell on the floor and he kicked it away from the front of the bed. He struck Robert on the head with his flashlight two times to subdue him. Photographic evidence at trial showed blood on the bed from Robert’s head injuries.
Brown wrote in his police report that the first thing he saw as he ran into the room behind Ammons and Kerry was Am-mons falling on top of Robert with the rifle in between them, but he did not recall in which direction the gun was pointed. However, he changed his account on redirect examination, now stating that the gun was already on the ground when he saw Ammons and Kerry falling over the defendant.
I n Sergeant Darron Kerry of the BPSO testified that he was one of the officers who had been dispatched to the residence the day before. He said he stopped by Ms. Sellers’ daughter’s house to check on Ms. Sellers. He urged Ms. Sellers to stay with her daughter. He said that she told him:
And at that time she told me that Robert hadn’t returned and that he had made a statement prior to running off in the woods that he would shoot or — I’m sorry, kill any — anybody that — -anyone that come looking for him in the woods and that he would kill any deputy that— that he seen.
The unsuccessful search was subsequently called off.
Sergeant Kerry was sent to the trailer again the next day when he received a call that Robert had returned to the residence. Kerry testified that they (the officers), or more specifically, Lt. Ammons, were talking to Robert trying to get him to come out because they actually had a commitment order for him. He said that they were trying to convince Robert that “they were not there to arrest him or anything like that, we were just, basically, wanting to get him to come out of the residence peacefully to — so we could take him to the hospital for treatment on the commitment order.”
Kerry said he was dressed in his uniform with a bulletproof vest under his shirt. Once Lt. Ammons pulled his Taser out of its holster and signaled he was about to do something, Kerry positioned himself to follow Ammons into the trailer. Kerry gave the following account of the events that followed:
As soon as — as we entered into the room Lieutenant Ammons, basically cleared the doorway. And as he cleared the doorway I could see then that Sellers was actually seated on the end of the bed with — with the firearm.
[[Image here]]
|12... the first view I had of Sellers was him sitting on the bed holding the firearm in an upright position, I would say probably at a 45 degree angle, probably to the floor, pointed, I wouldn’t say straight — not straight up but kind of at a, like I said, at a 45 degree angle.
[[Image here]]
Well, it went off. I heard the gun when it fired. And I took it as him being the one that fired it — since he was the one holding it.
[[Image here]]
Like I said, we — Lieutenant Am-mons — when we entered the room he grabbed Sellers. We — I was right behind him so we all kind of — I say we all, *1243 myself and Lieutenant Ammons all kind got there at about the same time and grabbed — grabbing Sellers and we all fell on the bed. We fell on the bed. The gun also fell, you know, on the bed with us. And there was a big — there was a struggle between myself, Ammons and Deputy Brown trying to handcuff and take Mr. Sellers into custody. During this time there — Lieutenant Am-mons had fired the taser as we entered into the bedroom. And there was, you know, there — when you fire a taser there’s a prong with lengthy wires on them attached. These — the wires was wrapped around myself and Deputy Brown. And the gun was also laying on the bed. Well we’re struggling with Sellers trying to handcuff him and take him into custody the — the—actually at one point we was trying to kick the gun — get the gun off the bed to get it away from all three of — all four of us. And as a result sometime during this struggle the gun — the muzzle of the gun was actually stuck up under my vest, you know, trying — as I think Deputy Brown was trying to kick it. And I was trying to shove it. And actually I had to stop and pull — pull the gun out from under my vest to actually ultimately get it off the bed.
On cross-examination, defense counsel, quoting from Sgt. Kerry’s police report made after the incident, noted that Kerry said,
... as I entered into the bedroom I observed Sellers holding a rifle in the upward position then falling back on the bed as Lieutenant Ammons was falling on top of him. As I was making contact with Sellers on the bed I heard a single shot coming from the rifle Sellers was holding.
11sSergeant Kerry acknowledged to defense counsel that the police report was correct where the report recited that they were falling back on the bed when the gun went off:
The gun did go off as we were — all three of us were on — making like I said, as I explained earlier we all made contact with Sellers at the same time. And during that the gun did go off.
Kerry was asked if he saw Mr. Sellers’ hand. He responded, “No, sir, most of the time when there’s a gun pointed at you, you’re watching the muzzle.” He again said that Sellers had the gun pointed upward at a 45-degree angle.
BPSO detectives Kay Ward and Roy Rawls interviewed Robert at BMSF on the same day of his arrest. Robert’s Miranda rights card was introduced into evidence objection as S-4. A recording of Robert’s interview was played for the jury and introduced into evidence as D-l. The interview lasted for 1 hour and 28 minutes, and included psychological manipulation tactics by the detectives, including promises and assurances that they were seeking only to obtain help for him. Robert repeatedly made suicidal statements and inquired about Lt. Ammons’ injury. He tried to explain the shooting incident, but did not make any statements about his mother. Ward testified that Robert spoke with a speech impediment, hung his head low, and avoided eye contact.
Drs. Vigen and Williams each testified that they had served on Robert’s competency and sanity commission. The doctors were accepted as experts in the fields of general and forensic psychology and clinical and forensic psychiatry, respectively. Dr. Vigen testified that Robert had the following conditions:
| ^problems with articulation and expressing himself;
a full-scale IQ score of 65 (99 percent of the general population would perform better than him); *1244 dysthymia (a general, long-term, chronic level of depressive feelings, low mood, low energy, and feelings of low self-esteem);
mixed, receptive, and expressive language disorder (trouble understanding, expressing, and processing language);
mild mental retardation;
avoidant personality feature (fearful of interaction with other people and is socially isolated);
secular or autistic thinking;
cognitive, social, and language impairments;
and an adjustment disorder (Robert’s reaction to being in a correctional facility).
Dr. Vigen stated that Robert was reluctant to speak with him and that he did not know Robert’s mental status at the time of the offenses. He also stated that there was not enough information to determine whether Robert knew the rightness or wrongness of his behavior and that there was no evidence of psychosis. On cross-examination, Dr. Vigen stated that Robert’s mental defects and retardation did not impair his ability to know right from wrong regarding the behavior in question.
Dr. Williams stated that he thought Robert was competent to stand trial, and his level of mental retardation (whether mild or moderate) did not interfere with his ability to distinguish right from wrong.
Robert was found guilty of aggravated battery (count one) and attempted incest (count two), with an 11-1 verdict for count one and a unanimous verdict for count two. The court ordered a presentence 1 ^investigation (PSI) to be submitted prior to sentencing.
During the sentencing hearing, held on January 22, 2013, the court recognized that the PSI had never arrived, but decided to go forward with sentencing; there was no objection by the defense counsel. The trial court made the following statements when imposing sentence:
I’ve taken all of those things I’ve just mentioned into considei-ation pursuant to Article 894.1 of the Code of Criminal Procedure. And, again, discussing the matter with your attorney regarding the arguments as to any leniency or mitigating factors that may apply to your overall sentencing.
I do not feel that you are eligible for a probated sentence, that you are at risk if released on probation that you would potentially harm someone else or yourself based upon the nature of the information and evidence that I heard at trial. The sentence I’m going to impose is one that I feel would — fits the evidence that was given at trial and the verdict of the jury. And that would — any lesser sentence would deprecate the seriousness of the offense.
It’s going to be the sentence of this court that on the attempted incest that you serve seven years at hard labor. On the aggravated battery it’s going to be the sentence, because that was the discharge of a firearm resulted in the injury to a police officer, I’m going to sentence you to 10 years at hard labor ... I’m going to run those two sentences concurrent with each other. You’ll be given credit for any time that you’ve served on this charge and this charge only.
Robert received La. C. Cr. P. arts. 930.8 and 914 advisement, but the record does not demonstrate that the trial court informed Robert of the sex offender notification and registration requirements as required under La. R.S. 15:543.
DISCUSSION
In his first assignment of error, Robert alleges that, although the evidence at trial *1245 proved Robert had the gun which discharged and caused injury to Deputy Am-mons, his actions did not constitute an aggravated |1fibattery. He contends that the state did not prove that he intentionally used force or violence upon Lt. Am-mons. Robert submits that, at such close range, had he intended to shoot Lt. Am-mons, the bullet would not have merely grazed his arm. Thus, the fact that the bullet only grazed Lt. Ammons’ arm demonstrates that it was an accidental shooting. Robert offers that the rifle could have been discharged by other factors such as his clothing or finger becoming snagged on the trigger during the struggle, or by his involuntary actions when he was tasered. He never threatened to shoot the officers, and he always kept the rifle pointed at the ceiling and away from the officers. He did not foresee that pointing the gun upward or at himself could result in the injury of the police officer.
By way of opposition, the state emphasizes that the jury accepted the testimony of the officers’ version of events, and that it was within the jury’s province to conclude that Robert, who had armed himself with a .22-caliber rifle and refused to submit to an arrest, had the specific intent to commit battery upon Deputy Ammons with a dangerous weapon.
The standard of appellate review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the | ^evidence for that of the factfinder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Dorsey, 2010-0216 (La.9/7/11), 74 So.3d 603. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003-1980 (La.4/1/05), 898 So.2d 1219; State v. Cunningham, 46,664 (La.App. 2 Cir. 11/2/11), 77 So.3d 477.
Aggravated battery is a battery committed with a dangerous weapon, La. R.S. 14:34. As it pertains to this case, battery is the intentional use of force or violence upon the person of another, La. R.S. 14:33. A gun qualifies as a dangerous weapon in that it is an “instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.” La. R.S. 14:2(3); State v. Bonier, 367 So.2d 824 (La.1979); State v. Singleton, 48,114 (La.App. 2 Cir. 6/26/13), 117 So.3d 306.
In this case, the sufficiency of evidence question centers on whether Robert intentionally shot Lieutenant Ammons or, as he claims, the rifle went off by accident, and he never intended to shoot Lt. Am-mons. As our review of the transcript shows, the jury heard somewhat variant accounts of the incident, especially Lt. Am-mons’ trial testimony compared to his account in his police report. It obviously chose to accept Lt. Ammons’ testimony at trial in which he said he saw Robert reach his hand to the trigger and point 118the gun toward him as he (Ammons) charged and tasered him. This detail was not in his *1246 original police report of the incident. The other officers did not see Robert shoot or point the gun at Lt. Ammons.
On close review, we find no internal inconsistency or conflicts with the physical evidence that would warrant rejecting his testimony regarding the shooting. The photographs in evidence showed a bullet hole in the ceiling and two others showed a 45-degree, grazing flesh wound on Lt. Am-mons’ arm. This indicates that the gun was pointed upward when it was fired, which is consistent with the testimony and physical evidence. All accounts by the officers established that Robert was sitting on the bed with the rifle pointed upward when the three officers charged, and the gun went off as they were all falling over Robert as he fell back on the bed. Only Lt. Ammons testified that he saw Robert move his left hand to the trigger and point it in his direction. The other officers simply did not see it. Although Lt. Ammons did not mention these key facts when he made his police report, the jury was made aware of this, and obviously accepted his explanation that his memory improved later.
There were inconsistent accounts by the officers regarding what happened with the rifle during the struggle with Robert on the bed. Lieutenant Ammons said he grabbed the gun and threw it to the floor. Deputy Brown first said it was on the bed, then he said it was already on the ground as they fell on the bed. Sergeant Kerry gave detailed testimony that the gun was on the bed during the struggle and the muzzle became stuck under his bulletproof vest as they struggled to subdue Robert. Eventually, it |18was kicked off the bed.
It is undisputed that the deputies did not go to the Sellers residence to arrest Robert for a crime, but to rather carry out a civil commitment order. Sergeant Kerry testified that they had a commitment order in hand, and the deputies assured Robert when they were trying to get him out of the trailer that they were not there to arrest him. The only conflict in this testimony was whether it was an emergency commitment where no signed order was required or an actual commitment order.
Robert’s mother testified that Robert had owned guns, enjoyed hunting, and had been taught gun safety. She testified that Robert had a driver’s license and that he knew all the rules. She did not believe he would intentionally hurt anyone. Dr. Vi-gen stated that there was not enough information to determine whether Robert knew the rightness and wrongness of his behavior, but felt Robert was competent to stand trial and assist in his defense. Dr. Williams stated that Robert’s mental disabilities did not interfere with his ability to distinguish right from wrong.
After review, under the standard enunciated in Jackson, supra, we conclude that a rational factfinder could have found that the elements of aggravated battery were proven beyond a reasonable doubt. There is no internal inconsistency or conflict with physical evidence that would warrant rejecting Lt. Ammons’ testimony that Robert intentionally shot him and the record does not contradict the jury’s conclusion.
Accordingly, this assignment of error lacks merit.
By his second assignment of error, Robert alleges that the evidence at 12ntrial was insufficient to prove he had the specific intent to commit incest, thus could not support a conviction of attempted incest.
Robert argues that the state failed to present evidence that he possessed a specific intent to engage in sexual intercourse with his mother. He states that a touch does not amount to sexual intercourse, and that the incest statute does not encompass sexual battery.
*1247 As noted by the state, Barbara testified about this incident which led her to call the police and Robert’s past actions towards her. The state also asserts that “the jury heard evidence pertaining to defendant’s confession which supported the sufficiency of evidence requirement for attempted incest.”
Incest includes sexual intercourse with any ascendant, with knowledge of this relationship. La. R.S. 14:78. The elements of the crime of incest are “intercourse coupled with knowledge of the relationship.” State v. Patrick, 513 So.2d 449, 453 (La.App. 2 Cir.1987), writ denied, 519 So.2d 140 (La.1988).
Attempt is defined as any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27.
Initially, we observe that Robert did not admit during his interview to doing anything to his mother other than repeatedly stating “I don’t know” |2iand other vague or unintelligible statements. As we appreciate the record, Robert does not admit to doing anything to his mother.
Although incest is a general intent crime, attempted incest requires a showing of specific intent. La. R.S. 14:78 and 14:27. At trial, Barbara testified that Robert came up behind her, patted her buttocks, pulled her pajama pants off, tried to “finger” her twice, and that it felt like he rubbed her. She also stated that she had to lock herself in the bathroom.
In the past, Robert has patted his mother’s buttocks while stating, “It’s mine.” In this incident, he attempted, according to Mrs. Sellers, to place his finger inside her vagina. Mrs. Sellers testified that he ripped her pajamas off and attempted to push her down on the bed. She was able to fight him off and escape to the bathroom where she locked the door to keep him out. We have no trouble concluding that, based on this evidence, a rational jury could have concluded that Robert had specific intent to commit incest with his mother.
Accordingly, this assignment lacks merit.
By his third assignment of error, Robert alleges that, given the facts and circumstances of this case, the trial court erred in imposing the maximum sentence as to each count to be served concurrently. He asserts that the sentences imposed are unconstitutionally harsh and excessive.
Robert argues that he does not fall in the class of worst offenders. He was 30 years old at sentencing, and had only one prior misdemeanor offense, a DWI. He suffered abuse as a child. The evidence shows that he suffers from a speech impediment, low IQ in the mildly mentally retardedj^range, mental impairments and suicidal tendencies.
Robert also notes that the court did not discuss the circumstances in which the shooting occurred, and that the court sentenced him without receiving the PSI it had earlier ordered.
The state contends Robert’s sentences of 10 and 7 years were appropriate: the 10-year sentence for aggravated battery because the offense involved a firearm in which a deputy sheriff was injured; the 7-year sentence because of the history of his behavior as described by the two members of the sanity commission and his mother.
 A reviewing court imposes a two-prong test in determining whether a sentence is excessive. First, the record must show that the trial court took cognizance *1248 of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reveals that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dillard, 45,633 (La.App. 20 Cir. 11/3/10), 55 So.3d 56. Second, a sentence violates La. Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980).
As a general rule, maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses. State v. Cozzetto, 07-2031 (La.2/15/08), 974 So.2d 665; State v. McKinney, 43,061 (La.App. 2 Cir. 2/13/08), 976 So.2d 802. Absent a showing of manifest abuse of that | ^discretion, an appellate court may not set aside a sentence as excessive. State v. Kidd, 45,638 (La.App. 2 Cir. 11/3/10), 55 So.3d 90.
The penalty for incest between an ascendant and descendant is imprisonment at hard labor for no more than 15 years. La. R.S. 14:78; the penalty for attempt sets a fíne or a term of imprisonment not exceeding one-half of the largest fíne, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both. La. R.S. 14:27. Thus, the maximum penalty for attempted incest is 7 ½ years. Robert received a sentence of seven years.
The penalty for aggravated battery is a fíne of no more than $5,000, imprisonment with or without hard labor for not more than 10 years, or both. La. R.S. 14:34. Robert received a 10-year sentence. We note also aggravated battery is a crime of violence as defined by La. R.S. 14:2(B)(5), and as such the defendant is ineligible for probation or a suspended sentence and is required to serve out 85% of his sentence before his release. La. R.S. 15:574.4(B)(1).
We note that the court ordered a PSI prior to sentencing. However, the PSI had not arrived when sentencing occurred. Robert’s counsel did not object to sentencing without the court-ordered PSI. A trial court is not required to consider a PSI prior to sentencing. La. R.S. 15:1132. However, the court is required to provide an adequate factual basis for a sentence imposed.
In this instance, the court stated that the maximum ten-year aggravated battery sentence was being imposed because an officer was shot; | ¡.¿however, the court did not provide any reasons why it imposed the near-maximum seven-year sentence for attempted incest. The court did not cite any mitigating factors, but noted that it “mentioned into consideration pursuant to Article 894.1,” that it had discussed “the matter with your (Robert’s) attorney regarding the arguments as to any leniency or mitigating factors that may apply to your overall sentencing.”
We need not recite again the facts regarding Robert’s diminished mental capacity, physical abuse, and psychological and social problems. The testimony of Drs. Vigen and Williams regarding these problems and their direct relationship to Robert’s difficulties in coping with ordinary life, including the current incident, clearly indicate that a lengthy incarceration would serve no purpose other than a needless infliction of pain and suffering. Courts have increasingly recognized that persons suffering from mental retardation are generally less culpable. See, Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (“Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial, but, by definition, they have *1249 diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand others’ reactions. Their deficiencies do not warrant an exemption from criminal sanctions, but diminish their personal culpability.”) In our view, the court should have considered Robert’s diminished mental capacity and mental illness as mitigating factors before imposing sentence.
| ¾-,Generally, a maximum sentence is imposed for only the most serious violations of the relevant statute and for the worst type of offenders. While the use of a firearm in a battery of a police officer is a serious offense, and has been used to justify a maximum sentence in some cases, the few cases we have found presented far more egregious circumstances. For example, in State v. Stucke, 419 So.2d 939 (La.1982), the supreme court affirmed a sentence of 10 years at hard labor for aggravated battery committed by a 28-year-old male first felony offender who had a prior arrest for aggravated battery and a misdemeanor conviction for possession of marijuana. The court specially noted that the evidence was sufficient to have justified a conviction for attempted second degree murder of an officer during the attempt to commit armed robbery. In State v. Kafieh, 590 So.2d 100 (La.App. 5 Cir.1991), the court held that the record supported the maximum sentence imposed for aggravated battery. Although the defendant was a first-time offender, he brutally attacked his victim with a knife, stabbing the victim twice in front of the her three young children. By contrast, the incident involving Robert and Lt. Ammons arose out of Lt. Ammons’ attempt to defuse a suicide situation and execution of a commitment order on a person with diminished mental capacity and psychological problems, and under circumstances in which the gun was being pointed at himself. Frankly, although we have already concluded that the evidence was sufficient to sustain the conviction for aggravated battery, the jury could have just as easily taken a different view of the evidence and acquitted the defendant of this charge.
12(jWe therefore find that the trial court abused its discretion by imposing the maximum sentence for aggravated battery in this case as it constitutes a needless infliction of pain and suffering, and does not reflect the defendant’s actual culpability for the offense committed.
For similar reasons, we conclude that the near-maximum sentence imposed for attempted incest is also excessive under the facts of this case. The circumstances of the crime indicate the seriousness of Robert’s mental problems and social dysfunction in a way not typical of most incest cases involving a parent and child, which almost always involve a parent who uses his or her position of authority to sexually abuse a child.
Nor does the sentencing record supply an adequate factual basis for the near-maximum sentence for attempted incest. Compliance with La. C. Cr. P. art. 894.1 was inadequate, and the sentencing court should have waited for the PSI it ordered, notwithstanding the defense’s failure to object.
For all these reasons, we conclude that the trial court abused its discretion by imposing excessive sentences, and that the sentences must be vacated and set aside. We conclude that the facts and circumstances that form the bases of these convictions call for concurrent sentences of far shorter periods of incarceration than those that were originally imposed, with credit for time served for concurrent sentences in *1250 accordance with La. C. Cr. P. art. 880.[5] Accordingly, we remand this case for re-sentencing in compliance with La. C. Cr. P. art. 894.1 and in accord with this opinion.
|a7A review of the record reveals that the trial court failed to inform Robert of the sex offender notification and registration requirements as required under La. R.S. 15:543. This should be corrected on resen-tencing.
CONCLUSION
For the foregoing reasons, we affirm the defendant’s convictions. We vacate and set aside the sentences imposed, and remand for resentencing on both convictions in accordance with this opinion, and for the trial court to provide notice of his sex offender registry requirements in accordance with La. R.S. 15:543.
CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING.

. Dr. Vigen was the other member.

. Exhibit S-l, photos 20, 21.

. After spending two and one-half years in the Bossier Maximum Security Facility and seemingly forgotten about, on May 9, 2012, Robert filed a pro se motion for a speedy trial and motion to dismiss for failure to prosecute. On May 15, 2012, the motions were denied as moot because the case was set for status conference.

.The amendment to the bill of information was presented to the court prior to the jury selection, but was not actually stamped filed until September 12, 2012.

. The trial court gave the defendant credit for time served for only one offense, aggravated battery. Under La.C.Cr.P. art. 880(E), where concurrent sentences are imposed, defendant receives credit for time served for both concurrent sentences by operation of law. When consecutive sentences are imposed, the defendant receives credit for time served for only one sentence. La.C.Cr.P. art. 880(B).